**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| GG TECHNOLOGIES INC. D/B/A STAYTOUCH<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 6:26-cv-701<br><br>COMPLAINT FOR PATENT INFRINGEMENT<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff GG Technologies Inc. d/b/a StayTouch ("StayTouch" or "Plaintiff") files this Complaint for patent infringement against Defendant Apple Inc. ("Apple" or "Defendant") alleging, based on StayTouch's own knowledge as to itself and its own actions, and based on information and belief as to all other matters, as follows:

## INTRODUCTION

1. The American system of free enterprise encourages and rewards creativity, innovation, investment, and hard work. That system relies on fair competition, the bounds of which are protected by law and the Courts.

2. StayTouch is a Santa Monica, California-based technology company that developed revolutionary technology for electronically sharing contact information in an easy way, and has invested substantial resources in bringing its application to consumers to allow them to enjoy the fruits of StayTouch's labor.

3. StayTouch has already expended substantial resources in asserting its intellectual property against Apple, in the United States and around the world.

4. In continued recognition of StayTouch's innovation and efforts, StayTouch was, on

the date of this Complaint, awarded (among others) U.S. Patent No. 12,784,009 ("'009 Patent"). The bounds of StayTouch's rights in its technology are protected, in part, by the '009 Patent.

5. A true and accurate copy of the '009 Patent is attached hereto as Exhibit A.

6. StayTouch has been awarded a utility patent in India with scope similar to the claim scope of the '009 Patent. In addition, the European Patent Office is nearing issuance of a European patent with similar scope to the claims of the '009 Patent.

7. StayTouch has previously asserted its patents against Apple in this Court, in the International Trade Commission in Washington, D.C., and in the courts in India.

8. Accordingly, Apple is aware (and has, since the issue date of the '009 Patent, been aware) of the existence of the '009 Patent.

9. Apple is also aware of StayTouch, is aware of StayTouch's allegations that Apple's products have hampered StayTouch's business, and is aware of the extent of StayTouch's investments in this country and abroad.

10. Apple is one of the largest companies in the world, and sells a substantial number of iPhone and Apple Watch products in the United States.

11. Until StayTouch introduced its revolutionary technology into the marketplace, users of Apple products did not have a way to easily share contact information simply by bringing devices into proximity of each other.

12. Until 2023, the only such solution for an Apple user was to download the StayTouch App. That changed with Apple's introduction of the NameDrop feature.

## **<u>THE PARTIES AND THEIR DISPUTES</u>**

13. Plaintiff GG Technologies Inc. is a Delaware Corporation with a principal place of business at 401 Wilshire Boulevard Suite 1200, Santa Monica, Los Angeles, 90401. At all times,

GG Technologies Inc. has been a Delaware Corporation with a California principal place of business.

14. Plaintiff is the owner, by assignment, of all right, title, and interest in the ‘009 Patent. Exhibit B hereto is a copy of the assignment recorded at the United States Patent and Trademark Office that conveys the rights in the ‘009 Patent to Plaintiff.

15. Defendant Apple Inc. is corporation organized and existing under the laws of California, with headquarters at One Apple Park Way, Cupertino, CA 95014, USA. Apple Inc. has one or more regular and established places of business in this District at least at 12545 Riata Vista Circle, Austin, Texas 78727; 12801 Delcour Drive, Austin, Texas 78727; 6800 W Parmer Lane, Austin, Texas 78729, and 3121 Palm Way, Austin, Texas 78758.

16. StayTouch sued Apple in this Court for infringement of U.S. Patent No. 12,022,369 (“‘369 Patent”) on April 10, 2026, in Case No. 26-cv-00237 (the “-00237 Case”).

17. Apple did not move to dismiss, transfer, or otherwise dispose of the -00237 Case. Instead, Apple answered StayTouch’s complaint on June 25, 2026. Thus, Apple did not dispute this Court’s jurisdiction or venue with respect to the -00237 Case.

18. For the same reasons as for the -00237 Case, jurisdiction and venue in this Court are proper for purposes of the instant Complaint.

19. StayTouch is also presently asserting the ‘369 Patent in the United States International Trade Commission in Investigation No. 337-TA-1520 (the “Investigation”).

20. Attached hereto as Exhibit C is a true and correct copy of the Notice of Institution of Investigation in the Investigation. The Investigation was instituted with a 100-day proceeding directed solely to the issue of economic domestic industry, as follows:

> (3) Pursuant to section 210.10(b)(3) of the Commission's Rules of Practice and Procedure, 19 CFR 210.10(b)(3), the presiding Administrative Law Judge shall hold an early evidentiary hearing, find facts, and issue an early decision within 100 days of institution as to whether the complainant has satisfied the economic prong of the domestic industry requirement. Notwithstanding any Commission Rules to the contrary, which are hereby waived, any such decision should be issued in the form of an initial determination (ID) under Commission Rule 210.42(a)(3), 19 CFR 210.42(a)(3). The ID will become the Commission's final determination 30 days after the date of service of the ID unless the Commission determines to review the ID. Any such review will be conducted in accordance with Commission Rules 210.43, 210.44, and 210.45, 19 CFR 210.43, 210.44, and 210.45. The issuance of an early ID finding that the complainant does not satisfy the economic prong of the domestic industry requirement shall stay the investigation unless the Commission orders otherwise; any other decision shall not stay the investigation or delay the issuance of a final ID covering all other issues of the investigation;

Ex. C at 2.

21. At present, the parties are awaiting a ruling on the issue of economic domestic industry, which is expected by early December, 2026.

22. Based on the Investigation, the -00237 Case is presently stayed pursuant to 28 U.S.C. § 1659.

23. The '009 Patent has not been asserted anywhere other than in this Court, in the instant Complaint, against Apple. Accordingly, there is no basis or reason to stay this case, including under 28 U.S.C. § 1659.

24. Apple is registered to do business in the State of Texas and has been since at least May 16, 1980.

25. On information and belief, Apple may be served with process through its registered agent, the CT Corp System, at 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136.

**<u>JURISDICTION AND VENUE</u>**

26. This action arises under the patent laws of the United States—Title 35 of the United States Code. The jurisdiction of this Court is proper under 35 U.S.C. § 271 *et seq.* and 28 U.S.C. § 1331, § 1332, and § 1338.

27. This Court has specific and personal jurisdiction over the Defendant consistent with

the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute.

28. Apple did not dispute venue or jurisdiction in connection with the -00237 Case.

29. Upon information and belief, the Defendant has sufficient minimum contacts with the forum because Defendant transacts substantial business in the State of Texas and in this Judicial District. Further, Defendant has, directly or through subsidiaries or intermediaries, committed and continues to commit acts of patent infringement in the State of Texas and in this Judicial District as alleged in this Complaint, as alleged more particularly below.

30. Venue is proper in this judicial District pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(b).

31. On information and belief, Defendant has transacted business in this District and has committed acts of direct and indirect infringement in this District by, among other things, making, using, offering to sell, selling, and/or importing products that infringe the '009 Patent as set forth below.

32. Defendant has many regular and established places of business in this District.

33. The Court has personal jurisdiction over Defendant consistent with the Texas Long Arm Statute and the Due Process Clause of the Fourteenth Amendment.

34. Defendant has purposely availed itself of the benefits and protections of Texas.

35. Defendant has maintained a presence in this District for years.

36. Defendant conducts continuous and systematic business in this District, including, among other acts, offering infringing products and services to those residing in this District and soliciting business from people residing in this District. Defendant makes infringing sales of the Infringing Products (as defined below) in this District. Defendant has committed infringing acts

within the Western District of Texas giving rise to this action and has established minimum contacts within the forum state of Texas.

37. This Court has general jurisdiction over Defendant due to its continuous and systematic contacts with the State of Texas, including its ownership and/or lease of land in the State of Texas, and other business activities throughout the State of Texas.

38. On information and belief, Apple maintains many regular and established places of business within the Western District of Texas including: (1) offices at its two Austin campuses located at 12545 Riata Vista Circle, Austin, Texas 78727 and 6900 W Parmer Lane, Austin, Texas 78729; (2) a manufacturing facility in Austin; (3) an engineering center at 320 S. Capital of Texas Hwy, West Lake Hills, Texas 78746; and (4) retail stores located at (a) 2901 S. Capital of Texas Highway, Austin, Texas 78746, (b) 3121 Palm Way, Austin, Texas 78758, (c) 7400 San Pedro Avenue, San Antonio, Texas 78216, (d) 15900 La Cantera Parkway, San Antonio, Texas 78256, and (e) 8401 Gateway Boulevard West, El Paso, Texas 79925.

39. On information and belief, and according to publicly available reports, the Apple Austin campus at 6900 W Parmer Lane initially employed over 5,000 people with the ability to employ up to 15,000 people. *See* https://www.apple.com/newsroom/2019/11/apple-expands-in-austin/.

40. On information and belief, Apple develops, makes, uses, imports, offers for sale, and/or sells in Texas and the Western District of Texas devices such as iPhones and Apple Watches that infringe the '009 Patent.

41. The Western District of Texas has been established as an appropriate venue for patent infringement cases against Apple in other cases, including (by virtue of Apple's non-challenge of the same) in the -00237 Case.

42. For example, in *Carbyne Biometrics, LLC v. Apple Inc.*, No. 1:23-cv-00324-ADA, Dkt. 84 (W.D. Tex. Feb. 12, 2024), Hon. Alan D. Albright denied Apple's motion to transfer the case to the Northern District of California. The Federal Circuit upheld this decision, denying Apple's petition for a writ of mandamus seeking to reverse the district court's ruling. *See In re Apple Inc.*, No. 2024-111, 2024 WL 1153977 (Fed. Cir. Mar. 18, 2024).

43. This Court similarly denied (and the Federal Circuit upheld the decision on mandamus) a motion to transfer venue in the case styled *Koss Corporation v. Apple Inc.*, No. 2020-cv-00665. *See In re Apple Inc.*, No. 2021-135 (Fed. Cir. Apr. 9, 2021).

44. Accordingly, the Western District of Texas is the proper venue for StayTouch's case against Apple, consistent with the facts and reasoning in at least the the *Carbyne* litigation and in the *Koss* litigation.

45. Apple employs hardware engineers in Austin, Texas, who work on Infringing Products such as iPhones and Apple Watches, and in particular on the various wireless communications chips (e.g., NFC and Bluetooth) that make NameDrop work, as well as on the security considerations presented by NameDrop, as evidenced by recent Apple job postings:




46. The RF Design Engineering job description explains the relevance of that job to the technologies that underly the Apple NameDrop feature.

47. The above is but one of many relevant job postings of the more than 600 total jobs

available in Austin, Texas on Apple's website as of the filing date of this Complaint that relates to the underlying technology that makes NameDrop work in the Apple ecosystem:




## STAYTOUCH AND THE '009 PATENT

48. StayTouch was formed in 2018 based on the vision of its founder, Mr. Gaurav Goel. A frequent attendee of networking events, Mr. Goel realized the inefficiency of various mechanisms for exchanging contact information with individuals he had encountered in his professional and personal life.

49. Handing business cards with a handshake still required additional steps for both parties to input that information in their electronic devices, and there was no guarantee that either (or both) recently acquainted parties would take that step. What is more, business cards are easily misplaced, and do not permit immediate follow-up upon receipt at an event.

50. Even some then-existing automation techniques, such as the scanning of QR codes embedding (or linking to) contact information, are not bi-directional, meaning that there is no guarantee both parties share their information with each other. Those techniques also require relatively involved user interaction, such as manipulating camera applications and clicking input mechanisms on their devices to ensure storage of the contact information when linked. And like

with business cards, the scanning of a QR code does not permit the instantaneous sending of a message saying "it was great to meet at the networking event."

51. Mr. Goel recognized the difficulty of many then-existing information exchange techniques that relied on a central server or other substantial infrastructure to facilitate the exchange of information between users. This requirement limits the applicability of prior contact transfer mechanisms to settings where reliable, secure, wireless communication networks are available, and thus eliminates the ability to transfer contact information in, for example, an airplane or in other places where WiFi and cellular service is not available.

52. Mr. Goel solved these and many other problems with the development and implementation of the StayTouch application:




53. StayTouch launched in July, 2019, and by September, 2019, the fanfare had built around this "fuss-free way of sharing contact information and remembering who we met where and when…" [https://techround.co.uk/news/staytouch-launches-to-revolutionise-the-way-we-make-connections/](https://techround.co.uk/news/staytouch-launches-to-revolutionise-the-way-we-make-connections/)

54. Since its public debut in 2019, StayTouch has rapidly gained global visibility and

recognition as an innovative contactless networking solution. Shortly after its beta launch, the StayTouch app reached the #3 ranking among new apps in the Google Play store, signalling strong early traction and market validation.

55. The novel concept of exchanging contact information by simply bringing smart devices close together resonated with professionals and enterprises worldwide, setting StayTouch apart from traditional networking tools.

56. In fact, as soon as StayTouch was launched in 2019, a YouTube video demonstrating the contactless transfer of information went viral and was viewed more than 60k times. https://www.youtube.com/watch?v=zobASAp7vg4.

57. To showcase its groundbreaking technology, StayTouch was invited to Web Summit 2019 in Lisbon and CES 2020 in Las Vegas; these appearances placed StayTouch among the ranks of leading tech innovators and attracted attention from investors, media, and enterprise clients across the globe.

58. StayTouch has been widely covered by TechRound, Forbes, Business Leader, Medium, Entrepreneur, and multiple international outlets in Europe, Africa, and North America. Reviews consistently highlighted the StayTouch app's simplicity, real-time functionality, and user privacy advantages. Positive feedback from users flooded app stores, with comments praising the app for replacing business cards, enabling smooth contact exchanges, and helping people "stay in touch with just a touch."

59. The StayTouch app was supported by aggressive and sustained marketing campaigns from 2019 through 2023, including partnerships with PR and digital marketing agencies such as Zorka Mobi, Dragon Horse, Madano, and DCI, and ambassador programs in major universities across the U.S., U.K., France, and India. Campaigns ran on YouTube, Google,

Facebook, Instagram, and TikTok, creating high visibility among both B2C and B2B audiences.

60. In addition to consumer adoption, enterprise interest surged in 2022 with the launch of StayTouch's beta B2B solution, leading to partnerships with corporations and municipal bodies such as the Paris 7th arrondissement, which adopted the platform as a secure internal and external communication tool.

61. Despite a temporary slowdown during the COVID-19 pandemic, StayTouch maintained momentum through targeted digital campaigns and elite university partnerships in the US and UK, revamping its business model and launching new features including community solutions and AI-driven engagement tools. The brand continued to scale, achieving milestones such as the grant of key patents in the U.S. and India in 2024, with a European patent expected soon.

62. With a strong presence in over 25 countries, endorsements from major tech events, and availability on both Apple App Store and Google Play Store, StayTouch continues to be a standout example of a globally relevant, patented, and commercially deployed contactless networking solution.

63. The StayTouch application embodied Mr. Goel's vision for a seamless, touch-to-tap experience where users can essentially "shake hands" with their mobile devices and in so doing, ensure that both parties receive the other's contact information for future use. With StayTouch, users no longer had to awkwardly type to tap information into their phone, or otherwise go through the prior art processes to enter information about new connections into their devices.

64. On May 9, 2019, StayTouch filed the provisional patent application that ultimately supported a non-provisional patent application that issued as the '009 Patent. The '009 Patent, which embodies aspects of the StayTouch application, issued on the date of the instant Complaint:

November 3, 2026. Ex. A at Cover.

65. The '009 Patent explains that it is directed to a "content sharing system [that] enables a smooth and easy exchange of electronic data." *Id.* at Abstract. It begins by noting the deficiencies of a number of then-existing electronic "fingerprint" exchange technologies including Apple's AirDrop technology. *Id.* at 1:30-42. The '009 Patent notes difficulties in scanning for nearby devices, pairing with a particular device, and bidirectionally exchanging information between those devices. *Id.* at 1:43-59. It also notes that existing electronic exchange mechanisms were not secure, owing in large part to the need to scan a relatively large area for potential pairing partners. *Id.* at 1:60-2:3. It thus sets forth "an improved system for data exchange in an effort to overcome" these and other deficiencies. *Id.* at 2:45-48.

66. In relevant part, the '009 Patent describes a system whereby a pair of devices can communicate "directly (via a proximity-based communications channel)" as shown in Figure 1:




*Id.* at Fig. 1; 5:32-36. It explains that the information exchanged between devices 101 and 102 can include "electronic contact information." *Id.* at 5:41-42.

67. In embodiments where the devices communicate "directly" with each other, they do so via "proximity-based communications channel 103" which can advantageously be (but need

not be) a near field communications (NFC) channel. *Id.* at 6:33-40. The '009 Patent specifically describes AirDrop from Apple® as one such suitable NFC channel. *Id.* at 6:42-44. The '009 Patent explains that there need not be a manual interaction to setup a connection between two devices. *Id.* at 6:53-56. This makes the transaction between devices seamless. *Id.* at 7:5-8.

68. Figure 2 of the '009 Patent demonstrates one example flow 2000 in which devices pair and exchange information without user interaction:



FIG. 2

*Id.* at Fig. 2. The '009 Patent illustrates an example of this flow in connection with Figures 8A-8C:




*Id.* at Figs. 8A-8D; 11:4-35. Importantly, the embodiment described in connection with Fig. 8 is one in which the user must accept a contact before it is sent. *Id.* at Fig. 8D; 11:33-35.

69. Claim 13 of the '009 Patent is representative as to Apple's *direct* infringement of the independent claims of the '009 Patent through, *inter alia*, its using, offering for sale, and sales of iPhones and Apple Watches that come out of the box supporting NameDrop:

| |
|---|
| 13. A computing device for facilitating the contactless exchange of digital information with one or more exchange devices, the computing device comprising: |
| a display screen; |
| a central processing unit for executing a mobile application, the mobile application providing a graphical user interface on the display screen; and |
| an antenna configured for proximity-based communication with the one or more exchange devices, |
| wherein the central processing unit automatically scans to identify the one or more exchange devices within a predetermined range via the antenna, |
| filters the scanned devices, |
| selects at least one of the one or more exchange devices for presentation on the graphical user interface, and |

| |
|---|
| directly exchanges at least a profile identification (ID) and a user ID with the selected exchange devices without manually pairing the user device with the selected exchange devices, |
| thereby prompting the selected exchange device to display a second user interface for accepting two-way communication for directly exchanging digital contact information with the user device. |

**APPLE'S AFTER-THE-FACT ENTRY WITH NAMEDROP**

70. On June 5, 2023, years after StayTouch launched (and on the heels of StayTouch surviving the COVID-19 pandemic), Apple made a press release touting the StayTouch technology, newly added to the Apple iPhone and Apple Watch ecosystem as "NameDrop":

> - With **NameDrop**, a new **AirDrop** experience, a user can hold their iPhone near another to share their contact information with only their intended recipients. Users can also choose the specific contact details they want to share — and, importantly, what information they don't want to share. Users can also share content like photos or links the same way. Apple Watch users can also use NameDrop by tapping the Share button in My Card in the Contacts app, or by tapping the My Card watch face complication, and then bringing Apple Watch face to face with someone else's Apple Watch. As with all AirDrop experiences, these new features securely share content over an encrypted connection.

71. Apple's explanation of how the feature works demonstrates just how similar NameDrop is to StayTouch, albeit as an integrated feature of the Apple iOS and Apple Watch operating systems:

> **Use NameDrop on iPhone**
>
> 1. Hold the display of your iPhone a few centimeters from the top of the other person's iPhone or Apple Watch.
> 2. Continue holding your devices near each other until NameDrop appears on both screens.
> 3. Choose to share your contact card and receive the other person's, or to only receive the other person's.
>
>    If you're sharing your contact card, tap ›, select the fields you want to include, then tap Save. The same fields will be selected by default next the time you use NameDrop.
>
>    To cancel, move the two devices away from each other or lock your iPhone before the NameDrop transfer completes.

72. Apple provides its NameDrop technology as part of the currently included operating system sold with Apple's iPhones and Apple Watches (collectively, the "Infringing Products").

73. On information and belief, Apple developed NameDrop with knowledge of StayTouch and the StayTouch technology.

**<u>COUNT I</u>**
**(Infringement of the '009 Patent)**

74. StayTouch incorporates by reference and re-alleges each and every allegation of the foregoing paragraphs as if set forth fully herein.

75. StayTouch owns all substantial rights, interest, and title in and to the '009 Patent, including the sole and exclusive right to prosecute this action and enforce the '009 Patent against infringers, and to collect damages and secure and enforce injunctive relief, for all relevant times. Ex. A; Ex. B.

76. The '009 Patent's claims are presumed valid under 35 U.S.C. § 282.

77. In particular, the '009 Patent claims are directed to patent eligible subject matter; they were examined in view of the Supreme Court's decision in *Alice Corp. v. CLS Bank*

*International*, 573 U.S. 208 (2014), and are thus presumed valid under 35 U.S.C. § 101 based on the same.

78. The claims of the ‘009 Patent are not directed to an abstract idea. Instead, they are directed to a concrete invention that uses various RF chips to permit specific mobile hardware devices to exchange information in a seamless way.

79. In addition, the claims of the ‘009 Patent are directed to an inventive concept as demonstrated by their allowance over the prior art of record, and by the fact that similar claims are presently allowed in a continuing application at the United States Patent and Trademark Office.

80. Defendant has made, had made, used, imported, supplied, distributed, sold, and/or offered for sale certain electronic devices (e.g., iPhones and Apple Watches with operating systems having a post-September, 2023 vintage, namely iOS 17.1 (or later) or watchOS 10.1 (or later), referred to as the Infringing Products) that provide users access to Defendant’s NameDrop technology. These acts constitute direct infringement of at least Claims 13 to 17 of the ‘009 Patent.

81. The claim chart attached hereto as Exhibit C demonstrates why Defendant’s products directly infringe at least Claims 13 to 17 of the ‘009 Patent.

82. For the entire life of the ‘009 Patent, Apple has been aware that users using the Infringing Products directly infringe the ‘009 Patent.

83. Thus, for the entire life of the ‘009 Patent, Defendant has possessed the requisite mental state to induce infringement and to be liable for contributor infringement of the ‘009 Patent under 35 U.S.C. § 271(b) and (c).

84. In particular, at least as of the filing of the Complaint, Defendant induces infringement of at least Claims 1, 7, and 13 of the ‘009 Patent by making, using, selling, offering to sell, and/or importing the Infringing Products, and subsequently instructing users of those

products to use the NameDrop feature when they use the Infringing Products to directly infringe the ‘009 Patent.

85. Apple provides instructions, user interfaces, and prompts within iOS and WatchOS that direct users to activate and use the NameDrop feature by bringing devices into proximity, selecting users, and confirming exchange of contact information.

86. Apple further promotes NameDrop through marketing materials, product documentation, and demonstrations that encourage users to use the feature in a manner that directly infringes the asserted claims.

87. Apple designed NameDrop specifically for proximity-based contact exchange functionality and knew or was willfully blind to the fact that such use would infringe StayTouch’s intellectual property.

88. Defendant is also liable for contributory infringement of at least Claims 1, 7, and 13 of the ‘009 Patent by providing, and by having knowingly provided, a material part of the instrumentalities, namely the Infringing Products, used to infringe Claims 1, 7, and 13 of the ‘009 Patent. The Infringing Products’ NameDrop feature has no substantial non-infringing uses. When an end user uses the NameDrop feature of the Infringing Products, the end user directly infringes at least Claims 1, 7, and 13 of the ‘009 Patent.

89. Since the issuance of the ‘009 Patent, Defendant has known that its making, using, selling, offering for sale, and/or importation would cause purchasers to directly infringe at least Claims 13 to 17 of the ‘009 Patent.

90. For at least the reasons set forth above, Defendant contributes to the infringement of the ‘009 Patent by others.

91. StayTouch has been damaged as a result of Defendant's infringing conduct alleged above. Thus, Defendant is liable to StayTouch in an amount that compensates it for such infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

92. StayTouch has complied with 35 U.S.C. § 287 with respect to the '009 Patent as to Apple because Apple has been on notice, by virtue of this Complaint, that StayTouch believes Apple infringes the '009 Patent since the day the '009 Patent issued.

93. That is, StayTouch has complied with 35 U.S.C. § 287 with respect to the '009 Patent by putting Apple on actual notice of its infringement of the '009 Patent.

94. StayTouch also complies with 35 U.S.C. § 287 by virtually marking its StayTouch App (StayTouch's only commercial product) with the '009 Patent on its patent marking website.

95. Defendant's infringement of the '009 Patent has caused StayTouch to suffer substantial and irreparable harm. In particular, Defendant's infringement of the '009 Patent has irreparably harmed StayTouch's ability to offer its products to users of the Apple ecosystem, as the features of StayTouch's products that practice the '009 Patent are contained in the Apple iOS and Apple Watch operating systems.

96. Defendant has been aware of StayTouch's belief that Defendant infringes the '009 Patent since at least the filing of this Complaint.

97. On information and belief, prior to the issuance of the '009 Patent, Defendant was aware that the '009 Patent would issue on November 3, 2026.

98. Defendant's infringement of the '009 Patent is and continues to be, willful, intentional, deliberate, and/or in conscious disregard of StayTouch's rights under the '009 Patent.

## **JURY DEMAND**

StayTouch hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, StayTouch requests that:

A. The Court find that Defendant has infringed the '009 Patent and hold Defendant liable for such infringement;

B. The Court preliminarily and permanently enjoin Defendant from further infringement of the '009 Patent;

C. The Court award damages pursuant to 35 U.S.C. § 284 adequate to compensate StayTouch for Defendant's past infringement of the '009 Patent (and to the extent not otherwise awarded an injunction, present and ongoing damages), including both pre- and post-judgment interest and costs as fixed by the Court;

D. The Court increase the damages to be awarded to StayTouch for patent infringement by three times the amount found by the jury or assessed by the Court;

E. The Court declare that this is an exceptional case entitling StayTouch to its reasonable attorneys' fees under 35 U.S.C. § 285; and

F. The Court award such other relief as the Court may deem just and proper.

Dated: November 3, 2026

Respectfully submitted,

*/s/ David N. Deaconson*
David N. Deaconson
Texas Bar No. 05673400
**PAKIS, GIOTES, BURLESON & DEACONSON, P.C.**
P. O. Box 58
Waco, TX 76703-0058
(254) 297-7300
deaconson@pakislaw.com

Benjamin E. Weed

*Pro Hac Vice* Forthcoming
**BEW LLC**
5336 Lyman Ave.
Downers Grove, IL 60515
ben@bewlawyer.com

**ATTORNEYS FOR PLAINTIFF GG TECHNOLOGIES INC. D/B/A STAYTOUCH**